UNITED STATED BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO
Honorable Howard R. Tallman

| | |
|---|---|
| In re: | ) |
| | ) |
| DWIGHT KENT POTTS, | ) Case No. 11-22624 HRT |
| | ) Chapter 7 |
| Debtor. | ) |
| | ) |

## ORDER ON OBJECTION TO CLAIM 3 AND 4

THIS MATTER comes before the Court on the Objection to Claim Nos. 3 and 4 filed by Blackwell Oil Company (docket #91) (the "Objection") and the Response to the Objection filed by Katherine and Jerry Potts (docket #96) ("Response"). An evidentiary hearing on the Objection and Response was held on January 14, 2013, and at the conclusion of the hearing, the Court took the matter under advisement and ordered the parties to submit supplemental citations of legal authorities. The supplemental citations were timely filed and the Court is now ready to rule.

I. Background.

Debtor is the son of Katherine and Jerry Potts (the "Potts") who are currently in their eighties. In 1977, the Potts acquired a property located at 531 Highway 285, Fairplay, Colorado. (the "A- Frame Property") for approximately $20,000. The property was built by Conoco Phillips, Jerry Potts' employer for many years, and was operated as a gas station, with above-ground gasoline storage tanks (Exhibit A). The Potts then added a convenience store, and managed the store and gas station, with the assistance of their four sons, including Debtor.

In 1983, the Potts acquired another property located at 379 Highway 285, Fairplay, Colorado, at the intersection of Highway 285 and Highway 9 (the "Commercial Property"). The Commercial Property had been a pharmacy and a gift shop, contained underground gasoline storage tanks, and was appraised in 1981 for a market value of $254,000 (Exhibit B). The Potts added new gas pumps and a canopy and remodeled the inside of the property. The Potts also added a large walk-in cooler to facilitate the sale of liquor at the store. Initially, the Potts, with the assistance of family members and others, worked in the store, "Grubb and Stuff," and resided in the apartment located above the store.

The Potts testified credibly that in 1987, they grew tired of managing both locations, and sold the A-Frame Property to Debtor, who agreed to manage it. According to the Potts, Debtor signed a promissory note for $50,000 in 1987 and made interest payments to them for a period of ten years. No contradictory evidence was provided, and the Potts' testimony was believable.

By 1997, the Potts had learned that the above ground storage tanks on the A-Frame Property were no longer compliant with federal and state regulations. As a result, the Potts began to re-evaluate its use as a gas station.[1] They also were growing tired of managing the Commercial Property. On June 5, 1997, the Potts, Debtor, and Debtor's then wife, Julie Potts, executed an "Agreement to Sell and Purchase and/or Exchange" ("Exchange Agreement") (Exhibit D). The parties determined that Debtor still owed the Potts $50,000 from the 1987 sale of the A- Frame Property. They also agreed that the Commercial Property was worth $450,000 and the A- Frame Property was worth $250,000. Thus, in the Exchange Agreement, the parties agreed that Debtor would execute one promissory note for $200,000, representing the difference in the value of the properties, and one promissory note for $50,000, representing the amount Debtor still owed on the 1987 sale (the "Notes") (Exhibits E, F). The terms of the Notes were that interest would accrue at 7%, with the first five annual installments to be interest only. After the first five years, the Notes were to be amortized over the balance of 15 years, with the entire amount due and payable on June 12, 2017. The $200,000 note was secured by a Second Deed of Trust on the Commercial Property, and the $50,000 note was secured by a Third Deed of Trust on the Commercial Property (the "Deeds of Trust"). The Deeds of Trust were executed on June 12, 1997, and recorded on June 16, 1997.[2]

According to the Potts' testimony, Debtor made regular payments under the Notes from July 12, 1998 through October 17, 2007. These payments were evidenced by the Potts' Form 1099 Interest Income from years 1997 to 2007 (Exhibit J), and the Potts' corresponding income tax returns (Exhibit I).

In 2003, a problem arose with renewing the liquor license for the portion of the Commercial Property that was operated as a liquor store. In order to renew the liquor license in the Potts' name, the parties executed a Lease Agreement (Exhibit K). Debtor established a corporation, "Sunbo," and under the Lease Agreement, Sunbo, as landlord, leased the liquor store to the Potts, as tenants. The Lease Agreement was for a period of two years, and then extended until November 1, 2008 (Exhibit O). The Potts made lease payments during the lease term totaling $15,000. (Exhibit L).

In 2006, Blackwell Oil Company ("Blackwell"), a petroleum supplier, sued Sunbo in state court, alleging breach of contract and unjust enrichment claims due to Sunbo's alleged failure to pay Blackwell a principal amount of $257,146.61. (Exhibit JJ). Sunbo's response in

---

[1] The A- Frame Property eventually was sold and is now a t-shirt shop. The Court has no further evidence on this matter.

[2] In November 2004, in connection with a refinancing, the Potts subordinated the Deeds of Trust to Peoples National Bank.

that action was generally that Sunbo had refused to pay the full amount owing because Blackwell had changed the pricing arrangement that had been in place for many years between Jerry Potts and Brian Blackwell's father.[3] Nevertheless, after a four-day trial held in September 2008, judgment entered against Sunbo for $344,892 on December 22, 2008.

In 2007, Debtor stopped making payments to the Potts under the Notes. Katherine Potts testified that when Debtor stopped making the payments, the Potts did not immediately foreclose on the Commercial Property because they did not want to take over its operation in their later years. When asked if she ever told Debtor that the Notes were cancelled or not to worry about the payments, Katherine Potts responded, "no way." Jerry Potts testified that it was their intention to work with Debtor on the payments. Katherine Potts also testified that the Potts stopped making lease payments to Debtor, because they instead began paying the attorney fees that Debtor was incurring after Blackwell filed suit against Sunbo in 2006. Debtor testified that he did not ask for the lease payments, reasoning that if he wasn't paying the Potts money on the Notes, they should not have to pay him the lease payments.

In October 2008, Sunbo sold Grubb and Stuff's furniture, fixtures, equipment, inventory, supplies and intangibles to Johnell and Tom Halts[4] and their company, Haltstop (collectively the "Halts") for $30,000. (Exhibit 15).[5] The Halts paid $10,000 up-front and agreed to pay the remainder in installments under a promissory note. The Halts also agreed to lease the property from Sunbo. In 2010, Blackwell sued Debtor, Sunbo, and the Halts in state court, alleging breach of fiduciary duty, unjust enrichment, alter ego, fraudulent transfer, civil conspiracy, and constructive trust (Exhibit KK). Trial was scheduled for June 7 to June 10, 2011. Debtor filed for bankruptcy 12 days before trial, and the state court action was stayed. On May 9, 2012, Blackwell filed proof of claim 2-1 in the amount of $430,830.69.[6]

---

[3] All parties, including Brian Blackwell (the current President of Blackwell), testified that the relationship between the Potts and the Blackwells went back many years, and that originally, the petroleum sales between the two families were based on an oral agreement.

[4] The Halts had been employed by Sunbo since approximately 2006. Johnell Halt was Sunbo's bookkeeper.

[5] Exhibit 15 was admitted in the trial held on January 28 and 29, 2013, in the related adversary proceeding between Blackwell and Debtor, #11-01592.

[6] Attached to the proof of claim was a statement that "Creditor supplied petroleum products to Debtor without payment 2004-2006, see attached State Court Complaint, see amortization of judgment awarded in Case No. 2006 CV 269." The only other documents

(continued...)

Glen Anstine was appointed as Chapter 7 Trustee ("Trustee") in the bankruptcy case. During the course of the bankruptcy, Trustee moved to sell the Commercial Property for $585,000, pursuant to an offer made by the Halts. Blackwell objected to the sale and offered to purchase the Commercial Property for $625,000. In October 2012, the parties agreed that Trustee would sell the Commercial Property to Blackwell for $625,000, and pay off the deed of trust to Peoples National Bank in the amount of $178,000, a real estate commission of $15,250, and closing costs. The parties agreed that the liens created by the Notes and Deeds of Trust would attach to the proceeds of the sale and would be satisfied by payment upon further order of the Court (docket #107).

II. Discussion.

    A. Proof of Claim 4.

The Potts filed a secured proof of claim 4-1 for $284,867.35 on May 24, 2012, and amended proofs of claim in January and February of 2013. In their most recently amended proof of claim ("POC 4") the Potts asserted that the amount of their secured claim, as of the case filing date, included $164,730.05 in principal, $71,545.36 in pre-petition interest (at a 12% interest rate), and $860 in pre-petition late fees, for a total of $237,135.41. The Potts then offset lease payments they owed to Debtor of $13,800, arriving at a claim amount, as of the petition date, of $223,335.41. The Potts then added post-petition interest, late fees, attorneys fees, and costs, subtracted a lease offset, and arrived at a total claim amount of $288,750.36.

In its objection to POC 4, Blackwell argued the following: (1) The Potts are not entitled to claim the default interest rate of 12% because they never declared the notes in default; (2) The conveyance of the Commercial Property to Debtor in 1997 was a gift rather than a purchase; (3) POC 4 should be disallowed as a secured claim under the doctrines of laches and estoppel; (4) The Deeds of Trust are void as an illusory obligation; and (5) The transaction was not at arms length and the Potts were not bona fide lenders. The Potts responded as follows: (1) The Potts are entitled to default interest under 11 U.S.C. § 506(b); (2) The conveyance of the Commercial Property was not a gift, especially considering the years of payment by the Debtor; (3) Laches does not apply, and the Potts are not estopped from asserting the claim under Colorado recording

---

[6](...continued)
attached were the amended complaint, filed February 4, 2011, in the second state court action, and an amortization schedule for a $344,892 claim amount at 18% interest from December 2008.

statutes; (4) the obligation is not illusory; and (5) the transaction was at arms length and there is no evidence of bad faith on the part of the Potts.[7]

The execution and timely filing of a proof of claim creates prima facie evidence as to the validity and amount of the claim. *In re Padget*, 119 B.R. 793, 797 (Bankr. D. Colo. 1990). Upon objection to a claim, if the objector presents evidence of probative force equal to or greater than that supporting the creditor's proof of claim and, thus, rebuts the prima facie effect of the claim, then the burden of proof shifts to the creditor. The ultimate burden of persuasion as to the validity and amount of a claim rests with the creditor. *Id., see also Agricredit v. Harrison (In re Harrison)*, 987 F.2d 677, 680 (10th Cir. 1993). For the following reasons, the Court finds that Blackwell has not presented evidence of probative force equal to or greater than that supporting the Potts' POC 4.

1. Laches and Estoppel.

As an initial matter, the Court will dispose of Blackwell's arguments regarding laches and estoppel. The elements of laches are: (1) full knowledge of the facts; (2) unconscionable or unreasonable delay in the assertion of an available remedy; and (3) intervening reliance by and prejudice to another. *In re Superior Constr. Co. v. Bentley,* 104 P.3d 331 (Colo. Ct. App. 2004). Laches is not applicable to a party who has no duty to act. *Keller Cattle Co. v. Allison*, 55 P.3d 257 (Colo. Ct. App. 2002). In this case, laches does not apply because the Potts had no duty to enforce the terms of Debtor's obligation any earlier than they did. In cases involving legal rights, the statute of limitations applies, not the equitable defense of laches. *Caldwell v. Armstrong*, 642 P.2d 47, 50 (Colo. Ct. App. 1981).

In *Castle Rock Bank v. Team Transit, LLC*, 292 P.3d 1077 (Colo. Ct. App. 2012), the Colorado Court of Appeals held that where a debt, based on a promissory note to be repaid in installments, is not accelerated by the creditor, the statute of limitations begins to run on the note's maturity date, not on the date the borrower first failed to make monthly installments. *Id.* at 1089. Here, the parties agree that the Potts never accelerated the debt (docket #91 at 2, docket #96 at 3). The Notes each provide that Debtor is to make installment payments until the debt is

---

[7] The Potts also argue that Blackwell does not have standing to object to the Potts' proof of claim because the Trustee did not do so, citing *In re Werth*, 54 B.R. 619 (D. Colo. 1985). That case stands for the proposition that generally the debtor (and in that case, his stockholders) cannot object to a creditor's proof of claim if the trustee has not done so. Under § 502(a), however, any party in interest may object to a proof of claim. *See* advisory committee notes to Fed. R. Bankr. P. 3007 ( "The Rule indicates indirectly that the standing to object to the claim in a Chapter 7 case is not restricted to the trustee"). *See also In re Tri-State Ethanol Co., LLC*, 370 B.R. 222, 235 (Bankr. D. S.D. 2007) (noting that while some courts have found that parties in interest are allowed to object only if the trustee does not act, others have held parties may object if they have an interest in the res to be administered).

paid, "however, if not sooner paid, the entire principal amount outstanding and accrued interest thereon, shall be due and payable on June 12, 2017." Katherine Potts testified that prior to the expiration of the statute of limitations, the Potts planned to make an economic decision regarding foreclosure based on the available information at that time. The Potts were within their legal rights in electing not to accelerate the debt or foreclose on the Commercial Property. *See, e.g., Watson v. CitiMortgage,* 2013 WL 2468035 (5th Cir. 2013)(secured lender did not waive right under deed of trust to accelerate or foreclose by engaging in negotiations for loan modification).[8]

The traditional elements of estoppel are: (1) the party to be estopped must know the facts; (2) the party to be estopped must intend that conduct will be acted upon, or must so act that the party asserting estoppel has the right to believe that it was intended; (3) the party asserting estoppel must be ignorant of the true facts; and (4) the party asserting estoppel must rely on the other party's conduct to his injury. *Penny v. Guiffrida*, 897 F.2d 1543 (10th Cir. 1990). In this case, estoppel does not apply because under Colorado's recording statutes, a person is deemed to have constructive notice of any instrument encumbering the title to real property once the document has been recorded in the office of the appropriate county clerk and recorder. *Arnove v. First Federal Sav. & Loan Ass'n of Tarpon Springs*, 713 P.2d 1329, 1330 (Colo. Ct. App. 1985).

Blackwell does not argue that the Deeds of Trust were improperly recorded. The evidence showed that the Potts recorded the Deeds of Trust in the Park County, Colorado real property records to secure Debtor's obligations under the Notes. Accordingly, any creditor deciding whether to lend Debtor money or extend credit could easily discover the Potts' encumbrance of the Commercial Property and weigh the lending risks provided by the Deeds of Trust. Additionally, the cases cited by Blackwell in its Objection do not support its position. *See, e.g., Aubert v. Town of Fruita*, 559 P.2d 232, 234 (Colo. 1977) ("appellant asserts that because appellees did not take positive action to protect their interests until the present suit was commenced, they are now estopped to assert their senior rights; and also, that by not commencing a court action sooner, the appellees are guilty of laches… we ascribe no validity whatsoever to these contentions…").

2. Illusory Obligation/Bona Fide Lender.

Likewise, Blackwell's arguments that the Deeds of Trust were illusory and that the Potts were not acting at arms length as a bona fide lender also fail. In support of its illusory obligation argument, Blackwell cites *In re Moulton*, 393 B.R. 752 (Bankr. N.D. Ala. 2008). That case involved a Chapter 13 debtor who arranged to transfer her home to her brother. The brother

---

[8] The Potts argue in the alternative that if Debtor defaulted on his loan obligations by failing to tender payment to the Potts on October 17, 2007, with the six-year statute of limitations running on each installment missed by Debtor, the Potts would have until October 17, 2013 to elect whether to pursue their remedies under the first missed installment payment.

arranged financing from a creditor but "a problem occurred when the closing attorney misappropriated the loan proceeds rather than paying [the lienholder] leaving the existing mortgage unsatisfied and the debtor unpaid." *Id.* at 756. Blackwell does not explain its illusory obligation claim beyond the citation to *In re Moulton*. In this case, Debtor recognized his obligation to repay the Potts by tendering payments for ten years, and there has been no absconding of closing funds or other similar circumstances that could support declaring the Deeds of Trust illusory.

According to Blackwell, "[t]o be a bona fide lender, three elements must be satisfied: The lender must have obtained an interest in the property (1) in good faith, (2) for value, and (3) without notice of any third party claim or interest." *In re Harydzak*, 406 B.R. 499 (Bankr. S.D. Tex. 2009). *Harydzak* involved a lender asserting an unsuccessful "bona fide lender" defense in an effort to save its lien rights after it had been tricked into encumbering a property by a scam artist. Here, there are no facts involving a third party asserting a lack of knowledge of the Potts' lien rights. The Potts sold the Commercial Property to Debtor and duly recorded the Deeds of Trust in the real property records for Park County, Colorado. Any subsequent third party is accordingly placed on notice of the Potts' interest through a search of the real property records, and is deemed to have constructive notice of the Deeds of Trust. *Arnove*, 713 P.2d at 1330. Additionally, there is no evidence of any bad faith conduct on the part of the Potts.

Thus, the Court has found that four of Blackwell's arguments are not persuasive. Whether or not POC 4 stands depends on whether the Court accepts Blackwell's argument that the transaction was a gift. If not, then the Court must address Blackwell's final argument about the appropriate interest rate to be applied.

### 3. Whether the transaction was a gift.

In Colorado, a gift exists when "the donor parts with all present and future dominion over the property given" and "must be absolute and irrevocable without any reference to taking effect at some future period." *Johnson v. Hilliard*, 160 P.2d 386, 388 (Colo. 1945). The donor must surrender dominion including the "parting of possession and relinquishment of all control, both present and future, of the property to the extent that it is beyond the power of the donor to recall it." *Id.* Here, the transaction involves Notes secured by corresponding Deeds of Trust, and Debtor made years of payments to the Potts from 1997 through 2007. The Potts have not surrendered all control to the property, due to the foreclosure rights under the Deeds of Trust.

Blackwell argues that the Potts' transfer of the Commercial Property to Debtor was a gift because the Debtor is the Potts' child. The case cited by Blackwell in support, *Matter of Marriage of Street*, 753 P.2d 424 (Or. Ct. App. 1988), illustrates the distinguishing facts used by the Oregon court to support its holding in that case that the transaction at issue was a gift. In the *Street* case, a father provided money to his daughter and son-in-law to build a home. *Id.* at 425. Months after the money had been transferred, the parties entered into a series of promissory notes

and deeds of trust. The *Street* court determined the transaction was a gift because of the delay between the transfer of the money and perfection of the father's deeds of trust. The case at issue is distinguished by the ten years of payments by Debtor and the fact that Debtor has always viewed the transaction as a loan rather than a gift. Additionally, unlike in *Street* there was no delay between the signing of the Exchange Agreement, the Notes, the Deeds of Trust, and the June 16, 1997, date of perfection. Thus the *Street* case is distinguishable.

Blackwell also argues that there is a common law presumption that transactions between parents and children are gifts. In support, Blackwell cites several cases that mention this presumption in the context of the creation of trusts and the dissolution of a marriage. Each of those cases, however, recognizes that any such gift presumption may be overcome upon a demonstration of proof as to the intention of the parties. *See Fister v. Fister*, 222 P.2d 620, 622-23 (Colo. 1950). The *Fister* case demonstrates that the proof necessary to overcome the gift presumption is minimal.

Here, the Potts and Debtor timely prepared and executed the Exchange Agreement, the Notes, and Deeds of Trust. There is no allegation that the Deeds of Trust were not properly perfected. The Potts' tax documents reflected ten years of payment by the Debtor. These documents, together with the parties' testimony, overcome any presumption that the transaction was a gift. The Court found the testimony of Katherine and Jerry Potts, that they consistently informed Debtor about their expectation of repayment, to be credible. Debtor also testified that he had consistently viewed the transaction as a loan rather than a gift. Thus, since the transaction at issue was not a gift, POC 4 stands, and the only remaining question as to POC 4 is the applicable interest rate.

    4. Interest Rate.

Blackwell argues that since the Potts have never declared the notes in default, they are not entitled to a default interest rate, and they are estopped from requesting default interest under 11 U.S.C. § 506(b) by their delay in demanding such interest, citing *In re AE Hotel Venture,* 321 B.R. 209 (Bankr. N.D. Ill. 2005). The Potts respond that they are entitled to the default interest rate as an oversecured creditor under § 506(b), citing *In re K &J Properties, Inc.*, 338 B.R. 450 (Bankr. D. Colo. 2005). The Court finds that neither case is dispositive of this issue.[9]

The Potts state that "Paragraph 4 in each of the Notes provides that the Secured Creditor is to receive interest on any unpaid amounts at the rate of 12% from the date due." However, the actual language of Paragraph 4 of each of the Notes reads as follows:

---

[9] These cases deal with whether a court should apply the default interest rate stated as written in the contract or whether the interest rate is subject to a reasonableness test. In both cases, however, the creditor had accelerated the debt.

> "If any payment required by this Note is not paid when due, or if any default under any Deed of Trust securing this Note occurs, the entire principal amount outstanding and accrued interest thereon shall at once become due and payable at the option of the Note Holder (Acceleration); and the indebtedness shall bear interest at the rate of 12% per annum from the date of default. The Note Holder shall be entitled to collect all reasonable costs and expense of collection and/or suit, including, but not limited to reasonable attorneys' fees."

When such language is used, courts have held that, in order for the default interest rate to apply, the creditor must notify the borrower of its intent to accelerate. *See In re Crystal Properties, Ltd., L.P.*, 268 F.3d 743 (9th Cir. 2001), where that court, interpreting similar language,[10] stated as follows:

> [T]he entire balance of principal and accrued interest then remaining becomes immediately due and payable "at the option of the holder." Therefore, the right to accelerate the unpaid debt is at the lender's option. The notes further provide that if the option is exercised, the notes will "thereafter bear interest . . . at the increased rate of five percent (5%) per annum over and above the rate contracted for herein." The use of the word "thereafter" can only mean that the default interest rate does not become effective unless the holder of the note exercises its option to accelerate. Therefore, we read the contract language . . . to require the holder to exercise its option to accelerate before the default interest rate is triggered.

Further, the court distinguished this language from that at issue in *In re PCH Associates*, 122 B.R. 181 (Bankr. S.D.N.Y.1990), where default interest was applied without acceleration, since no "option" decision was required. ("Following the occurrence of an Event of Default, interest shall accrue on the principal amount hereof at the rate of twelve (12%) percent per annum and shall be payable upon demand.")

---

[10] The language at issue in that case was "Should default be made in any payment provided for in this note, ... at the option of the holder hereof and without notice or demand, the entire balance of principal and accrued interest then remaining unpaid shall become immediately due and payable, and thereafter bear interest, until paid in full, at the increased rate of five percent (5%) per annum over and above the rate contracted for herein. No delay or omission on the part of the holder hereof in exercising any right hereunder, ... shall operate as a waiver of such right or any other right under this note...."

See also *In re Payless Cashways, Inc.*, 287 B.R. 482 (Bankr. W.D. Mo. 2002)(absent some affirmative action to accelerate debt, creditor could not charge default interest rate); *In re Tarkio College*, 195 B.R. 424 (Bankr. W.D. Mo.1996)(oversecured creditor did not properly accelerate note, as required to collect default interest rate under note as part of its allowed secured claim under 11 U.S.C. § 506(b)).

The language in the Notes is in the conjunctive. The entire amount of the principal and accrued interest becomes due and payable at the option of the Holder to accelerate the debt *and* the debt bears interest from the date of the default. The use of "and" indicates to the Court that acceleration must occur to start default interest running. The Notes thus required the Potts to take an affirmative action to exercise the option to accelerate the Notes in order to obtain interest at the default rate. To allow default interest to be claimed now would be prejudicial to other creditors. Thus, the Potts are entitled to interest at the 7% rate rather than the 12% default rate.

      5. Allowance of Late Fees

Finally, Blackwell argues that because the Potts never declared the Notes in default, they are not entitled to late fees. The Court disagrees and will allow the late fees provided for under the Notes. The Notes provide that "Borrower shall pay to the Note Holder a late charge of 1% of any payment not received by the Note Holder within 20 days after the payment is due." POC 4 includes late fees for 43 missed payments pre-petition and for 21 missed payments post-petition. Blackwell points to no language in the Notes – similar to the language entitling the holder to default interest only upon acceleration – that requires a declaration of default to activate the Debtor's obligations under the late fee provisions. To the contrary, the single qualification under the language of the Notes is that the payment not be paid with 20 days of the date it is due. The language of the Notes contains no further requirement in order for the late payment fee to become due and payable.

In *Dikeou v. Dikeou*, 928 P.2d 1286 (Colo. 1996) (en banc), the Colorado Supreme Court was faced with a note in the amount of $900,000.00 that provided for a $700.00 per day late payment fee. *Id*. at 1287. The trial court – affirmed by the court of appeals – refused to enforce the daily late payment fee because the fee bore "'no relationship . . . to any possible damage' that the creditor might have suffered due to the debtor's failure to repay the note according to its terms." *Id*. at 1287-88. But the Colorado Supreme Court said:

> In enacting the usury statute, the legislature determined that interest rates of up to 45% are reasonable and not usurious. *See* § 5-12-103(2), 2 C.R.S. (1992). Therefore, if the late charges in this case are determined to be interest and the total interest charged does not exceed 45%, then the late charges are reasonable as a matter of law and may be enforced.

*Id*. at 1288-89. The court found that late charges are properly considered interest under the statute and are enforceable because, when added to the 13% base rate of interest, they add up to a total effective interest rate of less than the statutory 45% limitation. *Id*. at 1295.[11]

The two requirements for enforceability of the late payment charge in *Dikeou* were: 1) that the charges are considered to be interest; and 2) that they did not cause the total effective interest rate to exceed 45%. The late fees in this case are clearly enforceable under Colorado law.

"The term 'interest' as used in [COLO. REV. STAT. § 5-12-103] means the sum of all charges payable directly or indirectly by a debtor and imposed directly or indirectly by a lender as an incident to or as a condition of the extension of credit to the debtor . . . ." COLO. REV. STAT. § 5-12-103(2). Under that statutory definition, the late payment charges provided for under the Notes are part of the interest agreed to by the parties. *See Dikeou*, 928 P.2d at 1289-90. The Court finds that, when added to the base interest rate of 7%, the late charges provided for by the Notes do not cause the total interest due under the Notes to exceed the 45% maximum under § 5-12-103. The late payment charges are, therefore, enforceable under Colorado law.

With respect to the post-petition portion of the late charges, § 506(b) imposes a reasonableness requirement:

> To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

11 U.S.C. § 506(b).

Courts refer to the law of the individual states in order to determine if fees and charges, such as the late payment charges in this case, are reasonable. *See, e.g., Mack Financial Corp. v. Ireson*, 789 F.2d 1083, 1084 (4th Cir. 1986); *In re LHD Realty Corp.*, 726 F.2d 327, 333 n.8 (7th Cir. 1984); *In re Dixon*, 228 B.R. 166, 177 (W.D. Va. 1998) ("The reasonableness of charges under section 506(b) is determined by reference to the relevant state contract law."). As a matter of law, the Court finds that the 1% late payment charge provided for under the Notes is reasonable under Colorado state law and, therefore, may be included in the Potts' claim under § 506(b). *See In re Neusteter Realty Co.*, 79 B.R. 30, 33-34 (D. Colo. 1987) (affirming the bankruptcy judge's inclusion of 4% late payment charges under § 506(b)).

---

[11] When late charges were added to the base rate, the calculated effective interest rate was 44.9%. *Id*.

6. Allowance of Attorney's Fees and Costs.

During closing argument, Blackwell argued that, because the Notes were never accelerated, the Potts were not entitled to attorney's fees and costs under Paragraph 4 of the Notes. The Potts disagreed, contending that the Notes provided for attorney's fees and costs upon default. Under § 506(b), attorney's fees and costs can be recovered from the debtor's estate if the secured creditor can demonstrate that it is oversecured in excess of the fees and costs requested, the underlying agreement provides for payment of such fees and costs, and the fees sought are reasonable in amount. *In re Williams*, 183 B.R. 895 (D. Kan. 1995). As part of POC 4, the Potts seek attorney's fees and costs totaling $40,132.39[12] and have attached, as Exhibit A-5 to POC 4, a detailed billing statement from Robinson Waters & O'Dorisio ("RWO") of services rendered to the Potts from May 23, 2012 to January 28, 2013. The Potts have shown that they are oversecured in excess of the fees requested. Thus the Court must determine if the Notes provided for payment of the fees and costs, and, if so, whether the fees and costs are reasonable.

The sentence of Paragraph 4 of the Notes regarding attorney's fees and costs is separate from the sentence that describes acceleration, and states, "The Note Holder shall be entitled to collect all reasonable costs and expense of collection and/or suit, including, but not limited to reasonable attorneys' fees." On its face, therefore, the Notes appear to provide for payment of the fees and costs for "collection and/or suit," so long as they are reasonable. While Blackwell argued at the hearing that acceleration was required, no legal authority was provided to support that argument. Thus, the Court concludes that the underlying agreement provides for the fees and costs.

The question of whether attorney fees sought by an oversecured creditor are reasonable is one of federal law. *In re Jemps, Inc.*, 330 B.R. 258, 262 (Bankr. D. Wyo. 2005). The Tenth Circuit Court of Appeals has adopted the standards for making a determination of reasonableness set out in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–719 (5th Cir.1974). *See In re Market Center East Retail Property, Inc.,* 2013 WL 5273135, *5 (10th Cir. 2013). The court calculates the lodestar amount of a fee, and then adjusts the fees in accordance with the circumstances of the case. *Robinson v. City of Edmond*, 160 F.3d 1275 (10th Cir.1998). In a case where fees are sought as part of a secured claim under § 506(b), other factors are considered also. The fact that a creditor is oversecured inherently provides protection for the claim. Thus, the creditor is only entitled to include services reasonably required to protect its interest in the loan. *In re Jemps* at 262.

The twelve *Johnson* factors are: (1) The time and labor required; (2) The novelty and difficulty of the questions; (3) The skill requisite to perform the legal service properly; (4) The preclusion of other employment by the attorney due to the acceptance of the case; (5) The

---

[12] That statement seeks $39,246.00 in fees, $1,216.39 in costs and, after accounting for a $330.00 voluntary reduction, requests total fees and costs of $40,132.39.

customary fee; (6) Whether the fee is fixed or contingent; (7) Time limitations imposed by the client or the circumstances; (8) The amount involved and the results obtained; (9) The experience, reputation, and ability of the attorneys; (10) The "undesirability" of the case; (11) The nature and length of the professional relationship with the client; and (12) Awards in similar cases. *Market Center* at *6.

(1) Time and Labor. This matter has been hotly contested. Blackwell objected to the Potts' claims on several grounds, requiring the Potts to respond to discovery, attend depositions, and support their claims at a full-day hearing. Because the Potts are elderly, and the documents at issue are old, more time and labor than usual was required on behalf of counsel in order to prepare for the depositions and hearings.

(2) Novelty and difficulty of the questions. The novelty and difficulty of the questions were not unusual, and the Court finds that certain fees charged for legal research on issues such as standing, the statute of limitations, and conflict of representation, are excessive. Additionally, some of the charges incurred in this regard appear either duplicative or unnecessary to the interest of the client (for instance, a conference with the debtor regarding case strategy, and multiple entries regarding the terms of the Trustee's sale of the Commercial Property). Thus, the Court has reduced some of these fees. *See In re Latshaw Drilling, LLC*, 481 B.R. 765, 798 (Bankr. N.D. Okla. 2012)( An oversecured creditor must act reasonably with regard to strategies or positions taken, time spent, and the number of lawyers engaged).

(3) Skill requisite to perform the legal service properly. Mr. Bruno is a highly experienced litigation counsel, and perhaps an attorney with less experience could have assisted the Potts effectively. However, the Potts have had a long-term relationship with Mr. Bruno, and his prior experience with the Potts family, and with the related state court litigation, most likely enabled more efficient representation.

(4) Preclusion of other employment. It does not appear that the acceptance of this case precluded the firm's employment in other matters.

(5) The customary fee. The hourly rate charged by the main attorney in the case, Mr. Bruno, was $300. It appears that another attorneys in the firm also worked on the case at a rate ranging from $125 to $205 per hour.[13] The billing rate is within the range of what the Court sees for experienced litigation counsel.

(6) Whether the fees are fixed or contingent. The fees are fixed and calculated based on an hourly rate.

---

[13] There was also a charge for legal research at a rate of $325 per hour by another attorney. The Court has subtracted this amount as excessive.

(7) Time limitations imposed by the client or other circumstances. The Potts were subject to, and met, court deadlines once the parties agreed to the dates leading up to the full-day hearing.

(8) The amount involved and the results obtained. The amount involved was substantial, and a largely successful result was obtained.

(9) The experience, reputation, and ability of the attorneys. Mr. Bruno has not frequently appeared before this Court but has extensive litigation experience. His work in this case was thorough and professional.

(10) There is no evidence that this was an undesirable case.

(11) Nature and length of the professional relationship with the client. Mr. Bruno had prior experience representing the Potts family in other matters which enabled him to efficiently represent the Potts in this matter.

(12) Awards in similar cases. Awards under § 506(b), in part, depend on the status of the secured creditor, whether it is oversecured, and the amount of opposition. Here, Blackwell was disputing that the Potts were even creditors, and claimed the exchange transaction was a gift. This is not a case where an uncontested, oversecured creditor over-billed in monitoring the case while awaiting its inevitable payout in full. Here, the Potts had to defend their secured position to obtain a payout from the funds held by the Trustee arising from the sale free and clear of liens on the Commercial Property.

After evaluating all the factors, the Court has determined the majority of the fees are reasonable, but require a reduction for unnecessary, duplicative and research charges, as follows:

    A. Charges disallowed as unnecessary (not primarily related to protecting Potts' secured interest):

The purchase offers for the Commercial Property by the Halts and Blackwell were both in excess of the liens on the property. Therefore, the Court finds that the time spent in this area, especially in objecting to the sale, were not necessary.

| Date | Amount Disallowed | Description |
|---|---|---|
| 8/8/12 | $41.00 | conference with debtor |
| 8/9/12 | $82.00 | review trustee sale |
| 8/9/12 | $150.00 | review trustee sale |

| | | |
|---|---|---|
| 8/10/12 | $225.50 | review objection to sale |
| 8/13/12 | $123.00 | response to sale objection |
| 8/14/12 | $61.50 | response to sale objection |
| 9/12/12 | $102.50 | concurrent representation research |
| | **$785.50** | **sub-total** |

B. Charges disallowed as excessive research/training:

The Potts were required to respond to an inordinate number of objection theories asserted by Blackwell. However, the Court finds the research for basic areas involving statutes of limitations and standing to object to claims should be absorbed as training overhead or as legal work that will benefit other clients, in addition to the Potts.

| Date | Amount Disallowed | Description |
|---|---|---|
| 8/14/12 | $87.50 | key cite by assistant |
| 8/26/12 | $1,332.50 | statute of limitations |
| 8/30/12 | $195.00 | standing |
| 8/30/12 | $225.50 | standing |
| 8/31/12 | $162.50 | standing |
| 1/17/13 | $348.50 | statute of frauds |
| 1/18/13 | $184.50 | statute of frauds |
| 1/21/13 | $225.50 | review case |
| | **$2,761.50** | **Sub-total** |

C. Duplicative or unexplained charges:

The Court will deduct for duplicate billing entries and for entries without any services description.

Page 15 of 18

| Date | Amount Disallowed | Description |
|---|---|---|
| 8/28/12 | $750.00 | review and revise response duplicative of 8/27/12 |
| 8/28/12 | $287.00 | duplicative of 8/29/12 |
| 10/30/12 | $180.00 | No description |
| 10/31/12 | $30.00 | No description |
| 11/01/12 | $120.00 | No description |
| 12/12/12 | $369.00 | duplicative of 12/11/12 |
| 12/18/12 | $307.50 | duplicative of 12/31/12 |
| 1/7/13 | $861.00 | Review stipulation duplicative of 1/9/13 |
| 1/24/13 | $553.00 | draft supplemental authority duplicative of 1/23/13 |
| | **$3,457.50** | **Sub-total** |
| | **$7004.50** | **Total Deductions** |

In summary, the Court will award $31,911.50[14] as reasonable attorney fees. The Court also finds that costs of $1,216.39 are reasonable for a total amount of $33,127.89.

Pursuant to Exhibit A* submitted to POC 4, the principal amount owing the Potts under both Notes is $164,730.05. Pre-petition interest at 7% calculated from October 12, 2007, to May 25, 2011, is $41,733.12. Post-petition interest at 7% calculated from the Petition Date, May 26, 2011, through February 1, 2013, is $19,492.30 at the non-default rate. Interest has continued to accrue at $31.59 per diem for both Notes, resulting in an additional interest amount of $7,645.28 until the date of this Order. Pre-petition late fees are $860.00.

---

[14] The Court has reduced the requested fees of $39,246.00 by the voluntary reduction of $330.00 for a total lodestar amount of $38,916.00 from which its deductions of $7004.50 result in a total fee of $31,911.50.

Post-petition late fees allowable under § 506(b) are $420.00. Adding attorney fees of $31,911.50 and costs of $1,216.00 results in a total allowed POC 4 amount of $268,008.25.[15]

B. Proof of Claim 3.

The Potts filed Proof of Claim 3-1 on May 24, 2012 in an unsecured amount of $23,727.09, and an amended Proof of Claim 3-2 on January 10, 2013, in an unsecured amount of $51,077.09 (POC 3).[16] The Potts allege that POC 3 represents payments made by the Potts for Debtor's attorney's fees, and that Debtor agreed to repay these to the Potts. Attached to POC 3 were copies of checks paid by the Potts to RWO from September of 2008 to December of 2011. That firm represented Sunbo in the state court litigation and also represented Debtor in the related adversary proceeding filed by Blackwell in this bankruptcy case from August 29, 2011, to October 23, 2012.[17] However, no corroborating evidence was provided in the form of billing statements from the firm that corresponded to these check payments. Jerry Potts provided testimony that the "matter number" on some of the checks was different from the "matter number" that related to the firm's later representation of the Potts, which would indicate that those checks were paid to Debtor's account with the firm. Nevertheless, several checks, including the ones made for the largest amounts ($13,500 and $15,000), did not have a "matter number" written on them.

In Blackwell's Objection to POC 3, it contended that any payments by the Potts for Debtor's attorney's fees were made as a gift, rather than a loan. Blackwell attached to the Objection a portion of Katherine Potts' deposition transcript, where she was asked about the payment of the attorney's fees, as follows:

Question (by Blackwell's counsel): "And when you're paying your son's attorney's fees — and you continue to pay his attorney's fees, is that correct?
Mrs. Potts: "Yes."
Question: "And is that a gift, or a loan?"
Mr. Bruno (Potts' counsel): "Object as to form."
Mrs. Potts: "Its just because he owes them."

---

[15] Regarding the lease amounts owed by the Potts, On January 16, 2013, the parties stipulated with the Trustee that if POC 4 were allowed, the Trustee would be entitled to deduct $22,300 from POC 4 for lease amounts owed to the estate (docket #126).

[16] The difference in the two amounts is that the first proof of claim offset lease amounts due by the Potts to Debtor. Those lease amounts were subsequently incorporated into the stipulation with the Trustee at docket #126.

[17] The firm ceased representing Debtor on October 23, 2012 due to its representation of the Potts in the underlying bankruptcy case.

Question: "You are just trying to help your son?"
Mrs. Potts: "Yes."
Question: "You don't have any agreement with him to be repaid?"
Mrs. Potts: "No."

There is nothing on the face of the checks to indicate that the amounts paid by the Potts are to be repaid by Debtor, and the Potts presented no evidence at the hearing which would support the characterization of the payments as loans. The Potts have shown that they knew how to structure and properly document loan transactions with their son in the Exchange Agreement, the Notes, and the Deed of Trust. Here, as to POC 3, there is none of that corroborating evidence to demonstrate that the Potts intended to be repaid for advancing attorney's fees and costs on their son's behalf. In the absence of such evidence, Blackwell sufficiently rebutted the prima facie effect of POC 3, and the Potts did not meet their ultimate burden of persuasion as to the validity and amount of that claim. Therefore, POC 3 is disallowed.

III. Conclusion.

For the foregoing reasons, Blackwell's objection is GRANTED in part, and DENIED in part. The objection to POC 4 is DENIED and the claim is allowed in the amount of $268,008.25. POC 3 is disallowed in its entirety.

Dated this   3rd   day of October, 2013.

BY THE COURT:

_____
Howard R. Tallman, Chief Judge
United States Bankruptcy Court